Good morning, Your Honors, if it's still morning. May it please the Court, Christopher Noth for the Plaintiff and Appellant, Lindsay Rogers. Your Honors, before we get into the issue of the two alternate realities that is the evidence in this case, we imagine the Court is going to want to hear from us on the mootness issue. And I'm pleased to report that we have a road map for this Court to follow on that issue. That road map, following Bear versus Neiman Marcus, and then following Bird versus Lewis and Clark College. The question before the Court is whether under the Title 388 claim, whether under the individual facts of this case, there is effective relief available that is injunctive relief or other orders. The ADA follows the civil rights remedies which talk about preliminary injunctions, temporary restraining orders, or other orders. Well, there's actually in the statute a generic term, which is what, preventative orders? Excuse me, Your Honor? Doesn't the statute say something like preventative orders? You know, a civil action for a preventative relief, including an application. So really the key question is what's an action for preventative relief? Right. And it may also be an open question whether or other orders is a catch-all because there is... Well, other order is a catch-all for something else that's a civil action for preventative relief. So we still have to know what's a civil action for a preventative relief. Understood, Your Honor. So in Bird versus Lewis and Clark, what happened there, that was a student in a wheelchair who attended a study abroad program and was denied access for certain activities that affected her grades. The question before the Court was after she graduated, did she still have standing to pursue injunctive relief in any manner whatsoever? And that Court held that because she had lower grades that were directly tied to the failure to accommodate, that she did. So there was effective relief available in the form of an injunction to prevent the school from releasing her grades that were affected that particular semester. Similarly, Your Honors, we have that opportunity here because there is evidence in the record. I point the Court to Ms. Rogers' declaration in Volume 2, starting at page 57. That declaration encapsulates Ms. Rogers' experience in this case. And at the end of that declaration, she discusses how after being effectively forced to leave Western, she did reapply to other schools. She could not bring herself to go back to Western. She was deterred from doing so based on her experience. And so therefore, she reapplied to Tufts, which had accepted her prior to starting Western. Tufts did not give her an interview because she believes she had to provide her transcript which showed two fails. And that those two fails, of course, were directly related to her experience. So in this case, Your Honor, the Title III claim is not moot because the Court below can issue an order upon a finding of liability that the school is prevented from releasing her fail grades or requesting that the Court modify those fail grades. But, I mean, maybe, but you'd have to demonstrate a direct connection between the failure to accommodate and the fail. There'd be an additional fact-finding that would be required, right? It would be the substantive fact-finding of the trial, yes, Your Honor. And that is exactly, of course, what we want the Court to do. But as to the rest of, I mean, as to the, oh, I guess you're going to have to prove that anyway to get damages, maybe. Correct, Your Honor. So we're seeking remand whether it's under Title III of the ADA or it's under Section 504 of the Rehabilitation Act or under the Unruh Act or the Unfair Competition Act. Ultimately, you have to demonstrate that there is, or in fact, that a summary judgment was improper on the facts. Of course, Your Honor. Okay, so let's get to that question. You want to get there. All right. Because it doesn't, I mean, as I understand it, whether there is a cause of action under the ADA or not, there is a cause of action under the Rehabilitation Act and some other statutes. What else? Correct, under the Unruh Act. So therefore, we're going to get to it anyway. So let's get to it. Thank you, Your Honor. I appreciate that. And yes, there was an alternative theory on mootness, which is declaratory relief where there is a split in the district courts. But it doesn't matter very much. Okay. I think we've really, let's get to the underlying case. Absolutely, Your Honor. So we distilled Ms. Rogers' experience into three particular instances where she was denied accommodations. The complete denial of alternative text materials, paramount importance. In her declaration, she discusses why it is that it's so important. I can listen to the text while I read it. And as a matter of background, Your Honor, her disabilities are ADHD and a learning disorder that severely affects her processing speed, her reading speed, her working memory, and other factors. So the alternative text, as she notes in her declaration, which she largely wrote, she needs to listen to the text while she reads it. It helps her understand the material better and more quickly, which is of paramount importance here. Ms. Lawler told me Ms. Lawler is the disability service officer that is at issue in this case. She was the person primarily responsible for determining, at least initially, what Ms. Rogers' accommodations were. The record demonstrates... There was a form, and the form that she didn't fill out said, contrary to what Ms. Lawler said, that the university would take the written text and essentially scan it and produce an alternative form. Now, Ms. Lawler seemed to say we don't do it. The form said we do do it. She didn't fill out the form. I don't know which way that all cuts, but no one's really explained this in the brief. Your Honor, I believe it's undisputed that initially the school, Ms. Lawler unequivocally informed Ms. Rogers that the school would not be providing alternative texts. I know, but this form does say that, doesn't it? Well, if, Your Honor, there's a very different set of facts. If the school had said, Ms. Rogers, we are happy to get you your accommodations. Please fill out this form, and we will provide them to you on day one. That is absolutely not the record in this case, Your Honor. The record in this case is that she was informed that the school does not provide or pay for alternative texts. But here, fill out this form. Eventually. The testimony is eventually. As Ms. Rogers continued to push for this, because it was so important to her, therefore, they ultimately said, look, fill this out. We'll see what we can do. That is not compliance under Title III of the ADA, Your Honor. The Title III of the ADA requires the institution. It is the institution's responsibility to provide auxiliary aids and services on day one. This is a first-year medical student. She was inundated with material and lectures and constant assessments, which I'll get to in a minute. But she was overwhelmed with what she had to do. And she was initially told, and she provided notice early in May of 2014, well before the start of the fall semester, that she needed these texts. And she was told unequivocally, we do not provide them to you. Counsel, I'm confused about some things in the record with respect to the alternative text. So there's a handbook from the AARC, and it's at ER 692. Oh, no, excuse me, that's Ms. Lawler's declaration. The handbook's at ER 745, and it lists alternative texts as a type of accommodation that Western would provide. Then there was a form that Ms. Rogers received. It's at ER 875, and it confirms that she'll receive alternative texts by eText or CD. Then there's the form that Judge Brezon was referencing. It's at SCR 111, and it explains how Western will disassemble the text and scan them and create some sort of alternative text for a student. But there's also Ms. Lawler's declaration saying we do not provide alternative text, and Ms. Rogers' testimony that Ms. Lawler told her that. But with the other information, the form telling her she would receive them, the form telling her, you know, fill this out and then we'll scan your books for you, and the handbook saying she could receive that, did she do anything when she spoke with Ms. Lawler to say, no, that's not correct, I do receive these, here's the form, I'm filling it out, here's what your form says, here's my request, provide alternative text? Right. Your Honor, I believe that the evidentiary record shows that that happened well down the line after she had been told. The box was checked as alternative text, but when she followed up with Ms. Lawler, the testimony will be, and taken in the light most favorable to Ms. Rogers, she was unequivocally told, we do not provide these. In fact, Lawler told Ms. Rogers to talk to the Department of Rehabilitation, talk to the publishers directly. That's what she was told. Eventually, if the form was filled out, it would not have been done in time for her classes. So the idea here is that the denial happened early on in her experience at Western. Just because Western ultimately did the right thing, which is really their defense here, completely misses the point of the need for auxiliary aids and texts and accommodations. They need to be in place from day one for a medical program, that's intensive. She was taking 12-hour exams on certain days. She was taking 6- to 8-hour exams regularly. There's the issue of the stop-the-clock breaks, but the point being here, she was in the program trying to keep up, and yet being told, talk to DOR. Talk to Comlex about your future accommodations. You probably won't be able to get these for testing. She was thrown off course, unlike any other student in the program. She was treated unjustly. And I just realized that I did not reserve time for rebuttal, and I would like to do so if I could reserve at least three minutes. But ultimately, Your Honor, what we have here is a distinct, different experience. And yes, I understand the defense has evidence that they will proffer, but Ms. Rogers does too. And if you look at the declaration and the supporting documents from her declaration, the prima facie case is made on either Title III or Section 504. So you can't expect a medical student to do everything a medical student is required to do, a typical kid, and advocate for herself incessantly, repeatedly, 75 times, and expect her to have full and equal opportunity to succeed. That is the threshold matter in this case. Was she given that full and equal opportunity? We don't. The judge seemed to take all the emphases in favor of the defense. That's contrary to the summary judgment standard. The case should be remanded. All right. Thank you, counsel. Good morning, Your Honors. May it please the Court, Mark Meyerhoff on behalf of the respondent, Western University of Health Sciences. I'll start with the substantive aspects of this case, setting aside the mootness for a moment, which I do believe does apply to the Title III claim. And the case cited by the appellant, the Bird case, was not cited anywhere in their briefs. So what? I mean, so what? They should have. But just logically speaking, why isn't it makes sense that some notation, even if they don't change the transcript, some notation in her file to clarify the circumstances for when they release a transcript would seem appropriate injunctive relief or preventative relief? Well, for two reasons, Your Honor, two main reasons. One is that this Court, just a couple of years ago in the Civil Rights Education and Enforcement Center case, said that a party has standing to sue for injunctive relief under Title III if it can show continuing adverse effects. Well, that's right. Well, go ahead. Keep going. I'm sorry. Continuing adverse effects in the form of failure to comply with the ADA that deters her from making use of the defendant's facility. That goes hand-in-hand with the three cases that we've cited where this Court, in addition to other courts, has said that once a student graduates from a program, there's no more case or controversy that is present. In other words— Well, there may not be as to whether she's going to get the accommodations, but there may be as to what's going to show up in her transcript as a result. But that would run afoul of this Court's holding just two years ago, which said that the relief has to have some relationship to the denial of the accommodations. There has to be some present case or controversy that would relate— The present case or controversy is that you're telling people that I failed this course and that it's going to make them think that it was because of my inabilities rather than the fact that it wasn't accommodated, and therefore I wanted some recognition of the circumstances once they've been determined. Well, two things as to that, Your Honor. In the Bear case, which also is from this circuit, the Court made it very clear that in order to grant relief like that, the relief would have to affect the relationship between the plaintiff and the defendant or Ms. Rogers and the university. It does. She's not asking for that at all. What's going to be in her file? She's asking for the Court to change the relationship between her and these speculative third-party medical schools that may accept her. She's asking for the Court to issue relief to change the mind of the scholarship company and hopefully not require her to repay the scholarship. So she's not asking for relief that changes the relationship or even relates the relationship between the university and her. She's asking for relief that somehow is going to change the relationship between her and these third parties. And by the way, this relief is entirely speculative. There's nothing in the record that indicates that such relief would get her admitted to medical school or relieve her obligation to repay her scholarship. Maybe so. A lot of what she's asking for may not work, but what's in her file is a dispute between her and the university. In any event, let's go on to the merits. I'll go on to the substance of it, Your Honor. The alternative text. At the outset, and it wasn't well down the line, it was in May of 2014, the school spoke to Ms. Rogers about alternative text and gave her that form, which asked her a number of questions, some of which she answered, most of which she did not. But she was told they weren't going to give her anything. She was told that. She was told that. She says she was told that anyway, so that's the record. I appreciate that, Your Honor. She was told that the university does not create these CDs or audio text. The form seems to say otherwise. Right. It's very confusing. I guess it's E-R-S-E-R-1-11. It says we will. A-R-E-C will scan the book and cut the pages and convert it and spiral the book, return to her. I don't understand this. Like, which is it? I believe I can explain it, Your Honor. So the idea of the alternative text is to allow her to run the text through a program where the program will speak the text as she reads it. The university was able to and offered her the opportunity to scan the text, and then she would have to run it through a program, which she admittedly had on her computer, which would then speak the text to her. So the university doesn't create the programs or the audio versions of these texts, but it does go as far as to offer her the opportunity to scan any text that she needed. But that's not what Ms. Lawler told her. Ms. Lawler told her that the university doesn't provide the audio, provide the CDs, or provide the programs. I thought she told her she had to go to either the manufacturers of the texts or some organization to get the text. She didn't say all you need to do is give us the book and we'll get it on your computer and you just have to push a button. Well, Your Honor, those organizations do provide the audio version. Maybe I'm not making it clear. No, you're not, because my understanding is, just from my own knowledge, that if you scan something in, you can get a program where you just push a button and it reads it. And that was the whole point. You could just put it on Kindle and it will read it. And that's what she had. But it's not what she was told. Well, she was told, and what the record shows is she was told that the university doesn't create or supply these audio texts. What the university does supply is the scanning of the text, which she was then able to run through, admittedly, as she admitted in her deposition, her own Apple program. And, by the way, to this date... As she admitted in her deposition? She admitted in her deposition that she understood that she could give the text to the university. They would cut it up, they would run it through, they would scan it for her, and all she had to do was run it through a program. That's what she understood. That's not from her deposition, but that's what the face of the form says. That's what the face of the form says, a form that she just didn't even bother to identify any text to the university that she wanted scanned. To this day, she has not even identified any text that she was denied through these other parties, the reading for the blind and dyslexic agency, the Department of Rehabilitation. There's no law and there's no case that requires the university to prepare these audio texts out of whole cloth. That's not a burden or a responsibility that the court holds, that any court to this date has held a university to. She was provided access and the avenues to obtain these texts, and she just simply failed to pursue that. The other two accommodations that appellant relies upon in claiming that they were denied is the stop-the-clock breaks and the failure to change her courses. I just want to address each one of those in turn as well. That's for the stop-the-clock breaks. It seems to be appellant's contention that her initial accommodation, which asked for double time and then a separate accommodation that asked for additional breaks, should have been interpreted by the university to mean those breaks would not count. She testified that she several times repeatedly, orally, clarified this and asked for it until later in April she put it in writing. But before that, she says that she actually did ask for it. Is that not so? Her testimony is ambiguous. That's the point. At best, her testimony is that she at some uncertain time and in some uncertain way raised the issue. That doesn't get her by summary judgment? No, it's not, Your Honor. Why? Summary judgment requires specific facts to refute to create a tribal issue. That's a specific fact. The specific fact is that I had months of asking for actual proper breaks that weren't coming out of my time. That's not a fact. Your Honor, it's not a her declaration, which is pretty much. I'm talking about her deposition. Her deposition itself says, on the one hand, that says that she didn't raise the issue because she felt that the university just assumed that double time contained or absorbed those additional breaks. And one time in her deposition she does say that she raised it with the university, but there's no specificity as to the time, who she raised it with, or what she said. There has to be a threshold for factual, specific facts in order to create a tribal issue. And as we said in our papers, those facts must be specific. They can't just be conclusory and they can't just be self-serving. Well, self-serving, it can be self-serving. Everything that's in a deposition from a plaintiff is self-serving, and from a defendant too, right? Of course it's self-serving, otherwise you wouldn't put it in. Well, what I meant, Your Honor, was simply self-serving without any specificity or foundation as to support that fact. And here, her vague claim in her deposition, I believe she makes once, that she did raise the issue of stop the clock time, there is no specificity, there is no foundation that ties it to any facts. Even if the court accepts the fact that she asked for stop the clock time in February of 2015, I think that it's fair to say that that's probably when she was raising these issues, in the spring semester, that she was given that accommodation by April of 2015. So even if the court were to believe that she somehow raised a tribal issue as to whether she asked for that time, the evidence is still undisputed to that. She was given that accommodation without any delay that would be actionable under Title III. But she already failed a class by then. Well, the classes she failed had nothing to do with the double time or to stop the clock. She failed IDIT and neurology. Both of those classes she was given double time in. At no time did she go to AARC, which she understood to be the facility that granted accommodations. And under the Winn case, a university is allowed to require students to use the proper procedures and to go to the proper people to request accommodations. There was no question that she knew how to ask for accommodations, as she repeatedly did, and was repeatedly given accommodations during the course of that year. But at no time can she point to any evidence, except April of 2015, when she went to AARP or went to Ms. Lawler and asked for stop-the-clock time. She knew how to. She knew there were appeal procedures. She knew she had at least five accommodations given to her prior to this where she used the proper facilities and proper avenues. But she didn't do it here until April of 2015. She says otherwise, though. I mean, I guess we're just hung up on this specificity stuff. She says, after months of asking them if we could do actual proper breaks that weren't coming out of my time or scheduling. And then she says later, I kept saying that I needed extra break time that didn't come out of my exam. You're just saying we just disregard it. That's not good enough because she has to give dates and places. Well, I'm not saying it, Your Honor, but the courts say it. An opposing party must set forth specific facts showing that it was a genuine issue for trial. Courts cannot rely on uncorroborated and self-serving. So understand the self-serving aspect, Your Honor. But where are you getting that from? Of course they can rely on uncorroborated and self-serving. Your Honor, I'm just quoting this Court's decision in Villaremo v. Aloha. Yes, but it then goes on to say that that's because in that case, I was on that case. I know what it is. Yes, I understand. And I know what it's been cited for. If you say something that you don't know from your personal knowledge, then you can't do it. That's self-serving, not because you say something that you actually say happened to you. But there's still a requirement to raise specific facts, that she has to tie her dispute to something specific, and she failed to do so. But the delay issue is still there as well, Your Honor. I mean, there's no question that she was given that accommodation, and there's no evidence. She also says, on a number of occasions, I tried to explain, and I did need that. And then in other schools, in other standardized tests that I had taken, they had set it up that way, so I had actual break times. So that's the third time she said that she did try to explain it. And, Your Honor, that statement alone just illustrates how vague it is. I mean, tried to explain it, so did she explain it? Did she not explain it? Did she feel that she was intimidated for some reason and couldn't explain it? Did she feel like she wasn't given a chance? It just begs the question whether she ever asked for it at all, and that doesn't create a tribal issue. She has the burden at this point, and she failed to meet that by failing to point to anything in the record that would show through specific facts that she actually made that request to the university at any point prior to April of 2015. My time is up, but if the court wants to address it. There was a third? The third accommodation, it was a schedule change, Your Honor, and what the evidence shows in regards to her schedule change is that in February of 2015, she expressed that she was having difficulty getting from her morning class, which because of the double time she received on exams, getting from that class to her afternoon class. Again, the evidence is undisputed that what she asked for in February of 2015 from... That's completely inaccurate. What happened, as I understand it, was that at the beginning of the semester, before February, Thresh came to her, and she raised the problem and asked for the accommodation, and then Thresh said to her, well, maybe we should switch it. And then he decided, well, no, we shouldn't switch it. And then in February, she went to him and specifically asked to switch it. He said, we'll see how it goes. And on February 1st, I'm going to know why I know the record better than you do, but I do. On February 1st, she specifically went to him in writing and said, what about going back to the switching? Well, on January 6th, Your Honor, she specifically asked for this law letter. On February, she specifically asked for it. Is that wrong? After Dr. Thresh told her that, well, maybe we can look at switching your schedule, and then she's told shortly thereafter that Dr. Thresh went to Dr. Lam. Right. Dr. Lam offered her the accommodation. And then what happened on February 1st? I'm sorry, Your Honor? Then what happened in February? On February 1st, she is, and I may have the specific February 1st email a little off, but she is told, I believe what the email you're referring to is that, Dr. Thresh told her that they can look at changing her schedule. She is then told that Dr. Thresh went to Dr. Lam. Dr. Lam agreed to give her the accommodation of coming to his class late. That was all that happened in January. In February, she went back and said he wants to revisit the ECM science class question, and then he says he'll take a look for the rest of the semester and see what looks best, but he won't be able to do until next week. And then she says she failed the last two IDIT exams, and she still had the scheduling problem, et cetera. I appreciate that, Your Honor. And I apologize. I do understand the email you're referring to now. The thing about that email, Your Honor, is that it doesn't specifically ask for a schedule change. What it basically does is relate to Dr. Thresh, and, again, not to Ms. Lawler, who is the appropriate person, but Dr. Thresh that she is still having problems getting from her IDIT double-time tests in the morning. And, by the way, there was only one test that she took in IDIT on a Monday morning when she then had to get to ECM for a graded assessment. There was only one time that that occurred on the same day. But what she's expressing is that she's rushing through her double-time exam because she feels that she has to get to Dr. Lam and that this is causing her anxiety, it's causing her stress, and that she has to wake up too early on the day she has an IDIT exam, and that's causing her stress. This would not have been relieved by a schedule change. The schedule change, which she doesn't specifically ask for in that email, but the schedule change would have still required her to go to an afternoon class, the OMM OTT class. All right, but that's a different point than the one you started with, which is that she never asked for it. So we now agree that she did ask for it. Not the schedule change, Your Honor. No, really? Okay. Dr. Thrush was the one prior to that email who raised the option of potentially looking at a schedule change, and then after he explored it, he went back to her. A February 2nd email to Dr. Thrush. OMM after an exam I think would be much easier to juggle, as there is usually not an OMM exam after a science exam. That's what she said. Okay, that's not. And then he says, before switching, let's take a look at future exams. Oh, wait a minute. On February 1st, he says, I don't know if it would be possible to revisit the ECM science class question at some point. Dr. Lantzmann, reasonably flexible, but so-and-so, and she asked for it. I mean, you know, she just did. So, Your Honor, what she says, and you read most of this already, she wants to revisit the class question. But what she describes, she doesn't ask for the accommodation, and there is discussion about it. I mean, that's the whole idea of the interactive process, to have discussion with the student. And after this email, she then eventually agrees, after Dr. Thrush tells her, okay, I think it's best you stay with your section. I don't think that this would, I don't think that Dr. Lamb, well, he spoke with Dr. Lamb, and Dr. Lamb wasn't going to ding her for coming in late. But what she says in this email is, last week I went for my six-hour IDIT exam, directly into a time-typing activity. It's unclear what class that was for. And then to a presentation to professors. It was an 11-hour day with no break. So what she's complaining about, and she doesn't ask for a schedule change, but what she's complaining about is the long day. That is because of her double time that she took for her test, and then having to go to an afternoon class. That was unavoidable. There was no schedule change that would have prevented her from having to go to classes for an 11-, 12-hour day. If she had changed sections and had the OPPOMM following her IDIT, instead of the Dr. Lamb's class, the time of the day would have been the same. And so, again, if you look at that email that you're focusing on, Your Honor, February 1st, she does not ask for the change. Your time is way up. Yeah, I was going to say that I think his time is well over, and you guys are quibbling over documents in the record that we can all read. So thank you, counsel. Thank you, Your Honor. And I think you have a few minutes left. Thank you, Your Honors. And I appreciate the questions. Obviously, it reinforces the idea that there's just two different experiences here, and this factual record absolutely begs for remand to allow a trier of fact to decide who is correct. The idea that Ms. Rogers agreed with Dean Thrush to the schedule is completely undermined by Ms. Rogers' testimony. She was begging for something to change. Whether she used the magic words of, I am requesting a disability accommodation, seems to be the defense's case. Well, it's also that she was talking with Dr. Thrush, and she should have been talking to AARC. And Ms. Rogers' testimony is that she absolutely did. In fact, Your Honor, the record shows that she first raised it with Ms. Lawler, who said to her, unbelievably, as a disability service officer, I can't make that decision. You have to talk to the deans. So what we haven't talked about are all the conversations she had with Dean Emmert, as well as Dean Thrush, as well as the 75 visits to AARC. So, again, this is all coming back to what was the experience like for this young woman who was just trying to do good in the world, right? I mean, that's why she's there. The double time on the exams, just to clarify the record, where counsel says that there was no prior notice of that request until 2015, is not supported. May of 2014, in her documentation, her initial documentation to AARC, included her MCAT accommodations, which clearly state double time plus breaks in order for rest. That's absolutely required by the Lopresti evaluation, and therefore these are all items, all the note takers, the paper exams, all of that she had to keep going back to Lawler for. And the reason why that happened was Lawler's testimony that she did not know what the different methods of evaluation were in Ms. Rogers' first year courses. She admitted that. So that's why all of this happened, because Ms. Lawler was unprepared to assist a student of Ms. Rogers' disabilities. So, Your Honor, we're here. Ms. Rogers was qualified for this program. She went to Oberlin, Bryn Mawr, and Columbia University. She testifies that she had these very same accommodations at those universities and that she had no problems. There was no prior litigation. It happened when she came to Western, and the reason was because their disability service officer was not prepared. So, Your Honor, there is a very distinct factual record, and the ADA, the whole purpose of the law, is to give people like Ms. Rogers an equal opportunity to succeed, not to guarantee their success, full and equal opportunity. Thank you, Your Honors. All right, thank you, Counsel. Rogers v. Western University of Health Sciences is submitted.
judges: Wardlaw, Berzon, Bade